Matthew J. Morrison (14562)
Morrison Legal Solutions
1887 N 270 E
Orem UT 84057
(801) 845-2581
matt@oremlawoffice.com

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHELSIE RIOS, on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TURF HOLDINGS, INC. D/B/A WEED MAN USA AND WM UTAH COUNTY LLC<br><br>Defendants. | COMPLAINT<br><br><br>Case No. **2:21-00039-CMR** |

**INTRODUCTION**

1. As the Supreme Court explained at the end of its term this year, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA,

generally prohibits robocalls to cell phones." *Barr v. Am. Ass'n of Political Consultants*, No. 19-631, 2020 U.S. LEXIS 3544, at *5 (July 6, 2020).

2. Plaintiff Chelsie Rios (hereinafter "Plaintiff") brings this action to enforce the consumer-privacy provisions of the TCPA alleging that WM County LLC ("WM County") sent automated telemarketing calls to him and other putative class members without their prior express written consent. WM County made these calls at the direction Turf Holdings, Inc. d/b/a Weed Man USA ("Franchisor").

3. The calls were made in the absence of an adequate "do not call" policy or training as well as making calls to individuals who have taken the affirmative step of registering their number on the National Do Not Call Registry.

4. Because telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse*, Plaintiff brings this action on behalf of a proposed nationwide class of similarly situated persons.

5. A class action is the best means of obtaining redress for the Defendants' wide-scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

**JURISDICTION AND VENUE**

6. This Court has subject-matter jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of each of the putative classes exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of proposed classes

that are each comprised of over one hundred members, and because at least one of the members of each of the proposed classes is a citizen of a different state than Defendant.

7.      The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

8.      This Court has personal jurisdiction over the Defendants because they conduct business in this District and made the telemarketing calls at issue into this District.

9.      Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, as the calls were made to the Plaintiff in this District.

### PARTES

10.     Plaintiff Chelsie Rios is a natural person who resides in this District.

11.     Defendant Turf Holdings, Inc. d/b/a Weed Man USA ("Franchisor") is a Delaware corporation with a registered agent of Corporate Creations Network Inc., 3411 Silverside Road, Suite 104, Wilmington, DE 19810. Franchisor owns the Weed Man lawn care services franchise.

12.     Defendant WM County LLC ("WM County") is a Utah limited liability company with a registered agent of Nicholas Miller, 115 E. 730 N. Santaquin, UT 84655. Upon information and belief, WM County is a franchisee of the Weed Man law care services franchise pursuant to a franchise agreement with Lawn Care.

### TCPA BACKGROUND

13. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

A. **The TCPA's requirement that entities have sufficient policies in place prior to making telemarketing calls**

14. The TCPA specifically required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

15. The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of . . . company-specific 'do not call systems . . .)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

16. Pursuant to this statutory mandate, the FCC established company-specific "do not call" rules. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C. Rcd. 8752 (Oct. 16, 1992) ("TCPA Implementation Order").

17. These regulations are codified at 47 C.F.R. §§ 64.1200(d)(1)-(7).

18. Specifically, these regulations require a company to keep a written policy, available upon demand, for maintaining a do-not-call list, train personnel engaged in telemarketing on the existence and use of its internal do-not-call list, and record and honor "do not call" requests for no less than five years from the time the request is made. 47 C.F.R. §§ 64.1200(d)(1, 2, 3, 6).

19. This includes the requirement that "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity can be contacted." 47 C.F.R. § 64.1200(d)(4).

20. These policies and procedures prohibit a company from making telemarketing calls unless they have implemented these policies and procedures. 47 C.F.R. § 64.1200(d).

21. Accordingly, all telemarketing calls violate the TCPA, unless Defendant can demonstrate that it has implemented the required policies and procedures.

**B.    The TCPA Prohibits Calls to the National Do Not Call Registry**

22. The TCPA also prohibits make multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5).

23. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

24. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

**C.    The growing problem of automated telemarketing**

25. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016),

https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

26. "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/system/files/documents/advocacy_documents/commentstaff-ftc-bureau-consumer-protection-federal-communications-commission-rulesregulations/160616robocallscomment.pdf.

27. *The New York Times* reported on the skyrocketing number of robocall complaints and widespread outrage about illegal telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-riseillegal.html; *see also* Katherine Bindley, *Why Are There So Many Robocalls? Here's What You Can Do About Them*, Wall St. J. (July 4, 2018), https://www.wsj.com/articles/why-there-are-so-manyrobocalls-heres-what-you-can-do-about-them-1530610203.

28. According to online robocall tracking service "YouMail," 5.6 billion robocalls were placed in October 2019 at a rate of approximately 180.6 million per day. *Robocall Index*, YouMail, https://robocallindex.com/ [https://archive.is/fwZD8]. In 2019, YouMail's robocall totals exceeded 58.5 billion. *Historical Robocalls By Time*, YouMail, https://robocallindex.com/history/time [https://archive.is/XWefY].

## FACTUAL BACKGROUND

**D.  Calls to Ms. Rios**

29. Plaintiff Rios is a "person" as defined by 47 U.S.C. § 153(39).

30. Ms. Rios's telephone number, (435) XXX-9252, is assigned to a cellular telephone service.

31. Ms. Rios's cellular telephone line is used for residential purposes.

32. Ms. Rios's cellular telephone line has been on the National Do Not Call Registry since 2017.

33. Ms. Rios has never utilized Weed Man lawn care services.

34. However, in the fall of 2017, a Weed Man lawn care services representative showed up unannounced at her house and requested a phone number.

35. Ms. Rios provided her phone number, but at no time did she agree to receive telemarketing calls regarding Weed Man lawn care services.

36. Nonetheless, shortly thereafter, Ms. Rios began receiving calls regarding Weed Man lawn care services.

37. On several occasions, Ms. Rios asked the Weed Man lawn care services representative to stop calling him.

38. However, the calls continued and have regularly occurred with multiple calls when WM Utah offers a spring discount to acquire new customers.

39. Despite her requests to not get calls, Ms. Rios received multiple calls in February of 2018, February of 2019 and February of 2020.

40. The defendants do not have or utilize an Internal Do Not Call list, as Ms. Rios continued to receive calls related to Weed Man lawn care services after these requests.

41. The defendants do not have or utilize a written policy pertaining to "do not call" requests.

42. Ms. Rios requested to no longer receive calls regarding Weed Man lawn care services, yet she continued to receive calls.

43. As such, to the extent a perfunctory written policy exists, the defendants have not trained their personnel on the existence or use of any internal "do not call" list.

44. Defendants continued to call Ms. Rios after his requests to cease calling, therefore defendants do not record or honor "do not call" requests.

## THE FRANCHISOR LIABILITY FOR WM COUNTY'S CONDUCT

45. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

46. In its January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

47. On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers such as the Franchisor may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases

without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

48. More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls.  28 FCC Rcd at 6586 (¶ 34).

49. The May 2013 FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call.  *Id.* at 6587 n. 107.

50. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts.  Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the

9

> TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 CC Rcd at 6592 (¶ 46).

51. The Franchisor knowingly and actively accepted business that originated through WM County's illegal telemarketing calls.

52. The Franchisor accepted business from and received profits from, illegal calls WM County made, even though the Franchisor had received complaints about the calling conduct of its franchisees and vendors. The Franchisor also fields complaints about telemarketing conduct of its franchisees.

53. In fact, in response to a complaint made to the Better Business Bureau when an individual received an automated call after she had cancelled her service, the Franchisor explained:

> We did look into the situation and review the call and apologize if there was any confusion or miscommunication. Our representative was calling from our centralized call center which is located here in the Carlisle, PA area and handles calls for each of our franchise units within our organization. It seems there was some confusion or miscommunication that you were speaking to someone from the Weed Man USA headquarters.

*See* https://www.bbb.org/ca/on/oshawa/profile/lawn-maintenance/weed-man-usa-headquarters-0107-1301262/customer-reviews (last visited January 16, 2021).

54. Despite this knowledge, the Franchisor continued its relationship with WM County.

55. The Franchisor had day-to-day control over its co-defendant's actions, including the ability to prohibit them from using automated telemarketing, or telemarketing to numbers on the National Do Not Call list to gain customers.

56.     The Franchisor failed to make such an instruction to its co-defendant, and as a result, is liable for its co-defendant's conduct.

57.     Additionally, the Franchisor controlled and restricted its co-defendant's ability to do business in geographic locations and promote Weed Man lawn care services.

58.     The May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46).  Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

## CLASS ALLEGATIONS

59.     As authorized by Rule 23(b)(2) or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of Classes of all other persons or entities similarly situated throughout the United States.

60.     The Classes of persons Plaintiff proposes to represent are tentatively defined as:

**National DNC Class:** All persons to whom: (a) WM County, and/or a third party acting on their behalf, made more than one non-emergency telephone calls; (b) promoting Weed Man lawn care services; (c) to a residential telephone number; (d) that had been listed on the National Do Not Call Registry for at least 31 days prior to the first call; and (e) at any time in the period that begins four years before the date of filing this Complaint to trial.

**Internal DNC Class**: All persons to whom: (a) WM County, and/or a third party acting on their behalf, made more than one non-emergency telephone calls; (b) promoting Weed Man lawn care services; (c) to a residential telephone number; and (d) who

11

were not a current customer of the defendants at the time of the call.

These two are collectively referred to as the "Classes".

61. Excluded from the Classes are counsel, defendants, and any entities in which defendants have a controlling interest, defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

62. The Classes are identifiable through phone records and phone number databases.

63. The potential members of the Classes number at least in the thousands.

64. Individual joinder of these persons is impracticable.

65. Plaintiff is a member of both Classes.

66. There are questions of law and fact common to Plaintiff and to the proposed Classes, including but not limited to the following:

    a. Whether defendants made calls to Plaintiff and members of the Classes without first obtaining prior express written consent to make the calls;

    b. Whether defendants maintained a written "do not call" policy;

    c. Whether defendants trained employees or agents engaged in telemarketing on the existence and usage of any "do not call" policy;

    d. Whether defendants recorded or honored "do not call" requests;

    e. Whether defendants' conduct constitutes a violation of the TCPA; and

    f. Whether members of the Classes are entitled to treble damages based on the willfulness of defendants' conduct.

67. Plaintiff's claims are typical of the claims of the Classes' members.

68. Plaintiff is an adequate representative of the Classes because her interests does not conflict with Classes' interests, she will fairly and adequately protect the interests of the Classes, and she is represented by counsel skilled and experienced in class actions, including TCPA class actions.

69. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of Class members, which will be ascertainable from records defendants and/or their agents maintain.

70. The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

## FIRST CLAIM FOR RELIEF

**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff and the Internal DNC Class)**

71. Plaintiff repeats the prior allegations of this Amended Complaint and incorporates them by reference herein.

72. Defendants placed numerous calls for telemarketing purposes to Plaintiff's and Internal DNC Class Members' telephone numbers, or others did so on their behalf.

73. Defendants did so despite not having a written policy pertaining to "do not call" requests.

74. Defendants did so despite not training its personnel on the existence or use of any internal "do not call" list.

75. Defendants did so despite not recording or honoring "do not call" requests.

76. Defendants placed two or more telephone calls to Plaintiff and Internal DNC Class Members in a 12-month period, or others did so their on behalf.

77. Plaintiff and Internal DNC Class Members are entitled to an award of $500 in statutory damages per telephone call pursuant to 47 U.S.C. § 227(c)(5).

78. Plaintiff and Internal DNC Class Members are entitled to an award of treble damages in an amount up to $1,500 per telephone call, pursuant to 47 U.S.C. § 227(c)(5).

## SECOND CLAIM FOR RELIEF

**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff and the National DNC Class)**

79. Plaintiff repeats the prior allegations of this Amended Complaint and incorporates them by reference herein.

80. The foregoing acts and omissions of defendants and/or their affiliates, agents, and/or other persons or entities acting on defendants' behalf constitute numerous and multiple violations of the TCPA, by making telemarketing calls to a residential telephone number that has been on the National Do Not Call Registry for more than 31 days prior to the first call.

81. As a result of defendants' and/or its affiliates, agents, and/or other persons or entities acting on defendants' behalf's violations of the TCPA, Plaintiff and members of the National DNC Class are entitled to an award of $500 in damages for each and every call made or up to $1,500 for each telemarketing call made deemed to be a "willful or knowing" violation.

82. Plaintiff and members of the Classes are also entitled to and do seek injunctive relief prohibiting defendants from making telemarketing calls to numbers on the National Do Not Call Registry, absent an emergency circumstance.

PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

    A.    Certification of the proposed Classes;

    B.    Appointment of Plaintiff as representatives of the Classes;

    C.    Appointment of the undersigned counsel as counsel for the Classes;

    D.    A declaration that defendants and/or their affiliates, agents, and/or other related entities' actions complained of herein violate the TCPA;

    E.    An order enjoining defendants and/or its affiliates, agents, and/or other persons or entities acting on defendant's behalf from making telemarketing calls to numbers on the National Do Not Call Registry, absent an emergency circumstance.

    F.    An award to Plaintiff and the Classes of damages, as allowed by law; and

    G.    Orders granting such other and further relief as the Court deems necessary, just, and proper.

### JURY TRIAL DEMANDED

Plaintiff, on behalf of himself and all others similarly situated, hereby demands trial by jury on all issues in this Complaint that are triable as a matter of right.

**Plaintiffs request a jury trial as to all claims of the complaint so triable.**

Dated: January 20, 2021

    Plaintiff,
    By Counsel,

    /s/ Matthew J. Morrison
    Matthew J. Morrison (14562)
    Morrison Law
    1887 N 270 E

Case 2:21-cv-00039-CMR   Document 2   Filed 01/20/21   PageID.17   Page 16 of 16


Orem  UT 84057
(801) 845-2581
matt@oremlawoffice.com

Anthony I. Paronich (*pro hac vice* forthcoming)
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
508.221.1510
E-mail: anthony@paronichlaw.com

Mary C. Turke, (*pro hac vice* forthcoming)
613 Williamson Street #201
Madison, WI
Telephone: (608) 237-1775
Fax: (608) 509-4423
mary@turkestrauss.com